UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
LOLITA ABRAMOVICH,

                Plaintiff,

        - against -

VINCENT OLIVA, WILSON VALERA, UNITED AUTO COLLISION CORP., 75 TOWING INC., UNITED TOWING INC., STYLAND RECOVERY INC., STYLAND COLLISION, INC., COUNTY RECOVERY SI CORPORATION, JOHN DOES 1-10, ABC CORPORATION 1-10,

                Defendants.
------------------------------------------------------------ X

**NOT FOR PUBLICATION**

**MEMORANDUM & ORDER**

No. 11 CV 1755 (ERK) (SMG)

KORMAN, J.:

       On December 27, 2009, plaintiff Lolita Abramovich's son, Nick Abramovich, was involved in a collision while driving his mother's car. [Compl. ¶ 17.] The car was a black 2009 Infiniti FX, and the collision occurred on the on ramp to the Staten Island Expressway. [Compl. ¶¶ 17, 18; DE 1 at 44.] Defendant Wilson Valera, an individual associated with defendant United Auto Collision Corp. ("United Auto"), an auto repair shop, and with defendant United Towing Inc., a towing company, approached Nick Abramovich and provided him "unsolicited assistance" with the damaged car. [Compl. ¶¶ 19, 20.] The plaintiff contends, however, that none of the named defendants are "authorized tows" for the Staten Island Expressway. [Compl. ¶ 19.] Valera and his business partner, defendant Vincent Oliva, promised the plaintiff that they would repair her damaged car within three weeks of the date of the collision.[1] [Compl. ¶ 21.]

---

[1] The defendants argue that they never offered to tow the plaintiff's car and that they never towed it, but rather, merely gave the plaintiff's son a business card for future reference. [Defs.'

On December 31, 2009, the plaintiff's insurance company, Sentinel Insurance Co. Ltd. ("Sentinel"), evaluated the car's condition and estimated that the repairs would cost $20,231.67 and would take 20 days to complete. [Compl. ¶¶ 22, 27; DE 1 at 25-35.] Because there was a $500 deductible to be paid by the plaintiff, the total amount that the insurance company would pay for repairs was $19,731.67. [Compl. ¶ 25; DE 1 at 34.] On January 4, 2010, Sentinel's parent company, The Hartford, paid defendant United Auto with a check for $19,731.67. [Compl. ¶ 24; DE 1 at 36.] United Auto accepted this payment and, to date, has not returned any portion of it. [Compl. ¶ 26.]

Although the repairs were estimated to take 20 days, United Auto did not complete the repairs in this time frame "purportedly because it was unable to obtain the necessary parts to repair the Plaintiff's Vehicle." [Compl. ¶ 28.] A United Auto employee, however, "presumably Defendant Vincent Oliva," told the plaintiff that the owner of United Auto had a "gambling problem" and had embezzled the $19,731.67. [*See* Compl. ¶ 29.]

On May 15, 2010, the plaintiff retained Robert E. Brown as her attorney to help her recover her car. [Compl. ¶ 34.] On May 24, 2010, Brown mailed a letter to United Auto, demanding the return of the plaintiff's car "in its current condition" by June 10, 2010. [Compl. ¶ 35; DE 1 at 37-39.] The letter also demanded that United Auto compensate the plaintiff for the damages she had incurred as a result of United Auto's failure to timely repair her car. [DE 1 at 37-38.] United Auto, however, neither completed the repairs nor returned the plaintiff's car by the requested date. [Compl. ¶ 36.]

---

Reply 4.] Because I am reviewing a motion to dismiss, however, I assume that the facts as stated in the complaint are true. *Green Hills (USA), L.L.C. v. Aaron Streit, Inc.*, 361 F. Supp. 2d 81, 84 (E.D.N.Y. 2005).

On June 22, 2010, Brown sent his private investigator, John Doherty, to United Auto to ask about the status of the repairs to the plaintiff's car. [Compl. ¶ 37.] Oliva gave Doherty a letter, made out to Brown, in which he confirmed that the repairs would be completed and the car returned to the plaintiff by July 14, 2010. [Compl. ¶ 37; DE 1 at 40.]

On July 9, 2010, Brown's office mailed United Auto a second letter, demanding that the plaintiff's car be returned by July 14, 2010, as Oliva had promised. [Compl. ¶ 38; DE 1 at 41-42.] In the letter, Brown explained that, on July 7, 2010, Doherty passed by United Auto and saw that no progress had been made on the plaintiff's car. [DE 1 at 41.] July 14, 2010, however, came and went, and United Auto once again failed to return the plaintiff's car by the promised date. [Compl. ¶ 39.]

In an effort to recover the car, the plaintiff and Brown's office took several actions. First, the plaintiff asked her insurance company to inquire into the status of her car's repairs. [Compl. ¶ 40.a.] She was told, however, that the company had already fulfilled its legal obligations pertaining to the plaintiff's claim and that monitoring the car's repair status was beyond the scope of its responsibility. [Compl. ¶ 40.a.] Brown and the plaintiff also attempted to file with the insurance company a stolen-vehicle claim, but the company said it would not honor such a claim without documentation from law enforcement. [Compl. ¶ 40.b.]

Brown and the plaintiff proceeded to contact the 120 Precinct to report the car as stolen, but they were advised that this was a "civil matter" and that, consequently, the plaintiff could only file a civil claim. [Compl. ¶ 40.c.] Brown's office then contacted the New York Police Department ("NYPD") Auto Crime Division, which also said that this was a civil matter. [Compl. ¶ 40.d.] Next, Brown's office contacted the NYPD Auto Larceny Unit, which similarly stated that this was a civil matter. [Compl. ¶ 40.e.] And when Brown's office contacted the

3

Richmond County District Attorney's Detective Squad, his office was told to contact the 120 Precinct. [Compl. ¶ 40.f.]

On or about May 13, 2010, the plaintiff filed a complaint against United Auto with the New York State Department of Motor Vehicles ("NYS DMV"). [Compl. ¶ 40.g.] On or around June 14, 2010, on the plaintiff's behalf, Brown filed a second complaint against United Auto with the NYS DMV. [Compl. ¶ 40.h; DE 1 at 43-44.]

On January 14, 2011, after months of investigation, the NYS DMV's Safety Hearing Bureau conducted a hearing on the plaintiff's claim. [Compl. ¶ 41.] In a decision issued on January 31, 2011, Administrative Law Judge Robert Krengel made the following findings of fact:

> a. That the evidence adduced at the January 14, 2011, hearing, established that on or about December 27, 2009, a 2009 Infiniti FX35 owned by Plaintiff was brought to Defendant United Auto located at 350 Front Street, Staten Island, New York, after sustaining collision damage in an accident.
>
> b. That an inspection at Defendant United Auto was conducted by the Insurance Company, and an appraisal was prepared in the amount of $19,731.67.
>
> c. That over the course of the next several months the Vehicle remained in Defendant United Auto's possession, but the facility never completed the repairs on the Vehicle.
>
> d. That on August 5, 2010, Inspector Richard Fossett of the NYS DMV visited the facility and inspected the said 2009 Infiniti, and found that the Vehicle had not been repaired to its pre-accident condition, but that only approximately twenty-five (25%) percent of the agreed repairs had been performed.
>
> e. That on August 5, 2010, Defendant Vincent Oliva told Inspector Richard Fossett that Defendant United Auto would complete the repairs in three to four weeks.
>
> f. That after four weeks, the repairs were not completed, and the Vehicle was still in the possession of the facility on January 14, 2011, which is the date of the hearing that these findings of fact were made.

[Compl. ¶ 42.]

4

As for the disposition of the case, Judge Krengel determined that

Charge 1 is sustained by the evidence establishing [Defendant United Auto Collision's] violation of VTL Section 398-e1(g), in that **the facility committed fraud or a fraudulent deceptive practice.** The evidence established that the facility received payment from [Plaintiff Lolita Abramovich] in the amount of $19,731.67 for the repair of the said 2009 Infinity, but as of August 5, 2010, the vehicle was still in an incomplete state without the performance of the repairs. The vehicle has not been returned to its preaccident condition. (*Emphasis supplied*).

Charge 2 is sustained by evidence establishing [Defendant United Auto] violation of Regulation 82.5(I) by failing to repair the said 2009 Infinity in a timely manner.

[Compl. ¶ 43 (alterations in original); DE 1 at 47.]

As a result of this determination, United Auto's repair shop registration with the NYS DMV was suspended for 45 days.[2] [Compl. ¶ 55; DE 1 at 45.] United Auto was also required to pay either (1) a civil penalty of $15,056.90 to the State of New York or (2) restitution to the plaintiff in the amount of $14,056.90—that is, the $19,731.67 that was paid to United Auto less $5,224.77, which was the cost of replacement parts. [Compl. ¶ 55; DE 1 at 45, 47.]

Rather than make either of these payments, however, Oliva continued conducting business but under the name of two different entities—namely, Styland Collision, Inc. and Styland Recovery—both of which have the same business address as United Auto: 350 Front Street in Staten Island, New York. [Compl. ¶ 56; DE 1 at 50-53.] As the New York Department of State's online database reveals, up until July 29, 2010, Styland Collision, Inc. was named "75 Towing Inc." [Compl. ¶ 57; DE 1 at 51.] And, according to this same database, Styland Recovery Inc. appears to have been formed on or around March 17, 2011. [DE 1 at 53.]

---

[2] As the plaintiff explains, United Auto consequently ceased doing business on January 31, 2011. [Compl. ¶ 54.]

5

On March 15, 2011, the plaintiff finally recovered possession of her car and, shortly thereafter, brought it to an Infiniti dealership to be repaired. [Compl. ¶ 44.] The plaintiff put down a $3,000 deposit for the repairs, which were estimated to cost between $6,500 and $7,500. [Compl. ¶ 44; DE 1 at 49.] The mechanics at the dealership informed the plaintiff that, despite the repairs, her car would "never be the same," in part because of United Auto's misconduct. [Compl. ¶ 45.]

## PROCEDURAL HISTORY

On April 11, 2011, the plaintiff filed a complaint in this Court against Vincent Oliva, Wilson Valera,[3] United Auto Collision Corp., 75 Towing Inc., United Towing Inc., Styland Collision, Inc., Styland Recovery Inc., County Recovery SI Corporation, John Does 1-10, and ABC Corporation 1-10 (collectively, the "defendants").[4] [Compl.] The plaintiff's complaint asserts the following causes of action: (1) violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), (2) breach of contract, (3) unjust enrichment, (4) conversion, (5) violations of New York General Business Law § 349, and (6) fraud. [Compl. ¶ 1.]

According to the plaintiff, Oliva is the incorporator, president, and sole/majority shareholder of the following named defendants: United Auto, 75 Towing Inc., Styland Collision, Inc., Styland Recovery Inc., County Recovery SI Corporation, and ABC Corporation 1-10 (all of which the plaintiff refers to as "Defendant Alter Egos"). [Compl. ¶ 47.] The plaintiff also contends that Oliva and Valera are co-owners of Defendant Alter Egos or that, in the alternative, they are partners or joint venturers with respect to these entities. [Compl. ¶ 48.] The plaintiff

---

[3] For some reason, the plaintiff incorrectly refers to this defendant as "Wilson Rivera" throughout her complaint.

[4] The plaintiff acknowledges that "John Does 1-10" and "ABC Corporation 1-10" are fictitious individuals and entities, respectively, but states that she has the intention to designate any and all individuals who acted in concert with the defendants. [Compl. ¶¶ 14-15.]

6

also asserts that Oliva and "John Does 1-10" are co-owners—or, in the alternative, partners or joint venturers—of Defendant Alter Egos.

Plaintiff alleges that Oliva and Valera exercised complete dominion and control over Defendant Alter Egos and "play a corporate 'shell game' with these entities in order to perpetuate fraud against their customers, including the Plaintiff, and to evade liability." [Compl. ¶¶ 52, 58, 61.] Put differently, the plaintiff asserts that Oliva and Valera "abused the privilege of doing business in the corporate form by establishing a host of corporate entities to perpetuate a wrong or injustice, **not only** against the Plaintiff, **but also** the State of New York and the public, both from New York and elsewhere, by evading their obligations and liability to the same." [Compl. ¶ 63.]

The complaint states that, based on conversations that the plaintiff's counsel had with personnel at the 120 Precinct and with Inspector Richard Fossett of the NYS DMV, "consumers **regularly** attempt to file complaints against the various and assorted entities formed by [Oliva and Valera]. . . . and [m]ost of these complaints go unheeded and are rebuffed as 'civil matters' with the result that most consumers have no remedy against the Defendants unless they incur the expense of hiring an attorney." [Compl. ¶ 59.] The plaintiff alleges that, when a customer's complaint is actually addressed by, for example, the NYS DMV, Oliva and Valera "merely 'close shop' and conduct business at the same location under a new or long forgotten entity in order to evade liability." [Compl. ¶ 60.] The plaintiff seeks to "pierce the corporate veil" of the Defendant Alter Egos and to hold Oliva, Valera, and/or John Does 1-10 personally liable, and the Defendant Alter Egos liable, jointly and severally, for the Defendant Alter Egos' obligations to the plaintiff, as if they were one and the same individual/entity. [Compl. ¶¶ 64-65.]

The plaintiff's first cause of action is a RICO claim. Specifically, the plaintiff claims that the named defendants "participated in an enterprise within the meaning of 18 U.S.C. § 1961(4), and have engaged in the solicitation of business purportedly for the towing and repair of vehicles, including vehicles disabled on interstate highways, such as Interstate 278, which is more commonly known as the Staten Island Expressway. . . . when in fact their purpose is to defraud unwitting consumers." [Compl. ¶¶ 67, 72.] The plaintiff alleges that the defendants' activities "are an enterprise that affects interstate or foreign commerce on the grounds that [the defendants] employ[] a towing operation on interstate highways and repair vehicles engaged in interstate travel." [Compl. ¶ 69.] The plaintiff alleges that the defendants "perpetuated a fraud not only against the Plaintiff, but also against other consumers—both from New York State and out-of-state—from whom [the defendants] solicited business." [Compl. ¶ 73.]

The first and second predicate acts alleged are Oliva's and Valera's violations of 18 U.S.C. § 1962(b), respectively.[5] [Compl. ¶¶ 74-85.] The third predicate act alleged is the violation of Section 1962(b) by the Defendant Alter Egos—that is, the named defendant entities. [Compl. ¶¶ 86-93.] In the description of this third predicate act, the plaintiff states that the Defendant Alter Egos, "in connection with [their] towing operation, tow vehicles from a commercial parking lot located at 62 Richmond Terrace, Staten Island, New York, without just cause." [Compl. ¶ 89.] More specifically, the plaintiff describes how an agent of United Auto remains in this parking lot "for the express purpose of dispatching towing trucks to tow the vehicles of customers of the stores adjacent to" this lot. [Compl. ¶ 90.] "If the customer leaves his or her vehicle unattended even for a moment," the plaintiff goes on, "an agent of Defendant

---

[5] Section 1962(b) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).

8

United Auto immediately dispatches a tow truck to tow the customers' vehicle—**even if the customer is a patron of the stores for which the parking lot is intended to serve.**" [Compl. ¶ 91.] And, "[i]n order to recover their vehicles from Defendant United Auto," the plaintiff explains, "consumers, at great inconvenience, are required to travel to Defendant United Auto's location at 350 Front Street, Staten Island, New York, and, upon information and belief, pay sums in excess of amounts permitted by law." [Compl. ¶ 92.]

As for predicate acts four through ten, the plaintiff simply states that "[t]he fraud perpetuated by the [defendants] is not a unique occurrence, but a repeat offense as noted by the personnel of 120 Precinct and Inspector Richard Fossett of the NYS DMV." [Compl. ¶ 95.] The plaintiff then asserts that "[e]ach instance of fraud perpetuated by the [defendants] against other members of the public has an effect on interstate commerce and constitutes a separate predicate act for the purposes of satisfying the requirements of 18 U.S.C. § 1961(5), namely that the [defendants] ha[ve] engaged in a 'pattern of racketeering activity.'"[6] [Compl. ¶ 96.]

For the defendants' alleged RICO violation, the plaintiff seeks treble damages of $59,195.01 in actual damages plus interest and $107,400 in consequential damages plus interest. [Compl. ¶ 103.] The base actual damages amount consists of the $19,731.67 the plaintiff's insurance company paid to United Auto, and which was never reimbursed. [Compl. ¶ 98.] And the base consequential damages amount consists of the lease and insurance payments the plaintiff made while the car was in the defendants' possession ($15,300), the cost of leasing a replacement car ($18,000), and legal fees paid to Brown's office ($2,500). [Compl. ¶¶ 99-101.]

---

[6] The plaintiff concludes her description of the fourth through tenth predicate acts by "reserv[ing] the right to amend this section [of the complaint] as more information is brought to light regarding the [defendants]." [Compl. ¶ 97.]

The plaintiff's second cause of action is for breach of contract. [Compl. ¶¶ 104-12.] The plaintiff claims that, through the letter Oliva wrote and signed on June 22, 2010, United Auto entered into a contract with the plaintiff to repair her car and return it to her by July 14, 2010. [Compl. ¶ 105; DE 1 at 40.] By failing to do so, however, the defendants allegedly breached the contract, since they did not perform the repairs as promised and did not return the plaintiff's car to her until March 15, 2011, after the NYS DMV had intervened. [Compl. ¶ 106.] The plaintiff again mentions that United Auto accepted $19,731.67 from the plaintiff's insurance company and never returned these funds. [Compl. ¶ 107.] As for damages, the plaintiff asks for $19,731.67 in actual damages plus interest (for the amount paid to United Auto) and $35,800 in consequential damages plus interest (for the lease and insurance payments on the car, cost of a replacement car, and legal fees). [Compl. ¶¶ 108-12.]

The plaintiff's third cause of action is for unjust enrichment. [Compl. ¶¶ 113-19.] The plaintiff asserts that the defendants were unjustly enriched in the amount of $19,731.67—the amount paid by the plaintiff's insurer to United Auto—because the plaintiff did not receive any benefit from the payment of this money, as the car was not repaired and returned as promised. [Compl. ¶¶ 115-16, 119.] By contrast, the plaintiff continues, United Auto has retained funds in a manner not bargained for by the plaintiff and that, by doing so, has damaged the plaintiff. [Compl. ¶ 118.] The plaintiff thus seeks $19,731.67 in actual damages plus interest. [Compl. ¶ 163(e).]

The plaintiff's fourth cause of action is for conversion. [Compl. ¶¶ 120-30.] The plaintiff alleges that she is the rightful owner of the $19,731.67, which her insurance company disbursed to United Auto, that United Auto failed to use these funds for their intended purposes (to repair the plaintiff's car), that the plaintiff's interest in these funds is superior to United

Auto's, and that United Auto is "unlawfully controlling and expending" these funds for its own purposes. [Compl. ¶¶ 122-25.] The plaintiff claims that she is entitled not only to $19,731.67 in actual damages and $35,800 in consequential damages, but also to $3 million in punitive damages. [Compl. ¶¶ 127-28, 130.]

The plaintiff's fifth cause of action is for violations of New York General Business Law § 349. [Compl. ¶¶ 131-45.] Specifically, the plaintiff asserts that United Auto's "fraudulent acts and other malfeasance constitute deceptive acts and practices in the conduct of a business, trade or commerce or in the furnishing of a service," as those terms are used in the statute. [Compl. ¶ 133.] These "fraudulent acts and other malfeasance" include United Auto's solicitation of business on the Staten Island Expressway, despite not being an "authorized tow" for this expressway, and United Auto's towing of cars, without just cause, in the commercial parking lot at 62 Richmond Terrace. [Compl. ¶¶ 137-41.] The plaintiff contends that "United Auto's towing and vehicle repair operation affects the public interest in general" and, because she herself has been damaged, she seeks the statutory maximum of $1,000 in damages plus attorney's fees. [*See* Compl. ¶¶ 142-45.]

The plaintiff's sixth cause of action is for fraud. [Compl. ¶¶ 146-62.] The plaintiff argues that Administrative Law Judge Krengel's holding that United Auto "'committed **a fraud or a fraudulent or deceptive practice**' against the Plaintiff" is prima facie evidence that United Auto committed a fraud against her. [Compl. ¶¶ 148-49.] The plaintiff alleges that she did not know about the falsity of the statements United Auto made to her with respect to the repair of her car and that, in reliance on these false statements, she entrusted United Auto with her car and had her insurance company make a payment to United Auto for the car's repair. [Compl. ¶¶ 150-52.] The plaintiff adds that United Auto knew its statements to the plaintiff were false and that, by

11

making them, intended to deceive the plaintiff. [Compl. ¶ 153.] United Auto's false statements consisted of its having told the plaintiff, in writing, that her car would be repaired and returned to her by July 14, 2010. [Compl. ¶ 154.] The plaintiff again asks for $19,731.67 in actual damages and $35,800 in consequential damages. [Compl. ¶ 160.] And, because United Auto's allegedly fraudulent acts were "willful, wanton and of a recurrent nature," the plaintiff seeks $3 million in punitive damages. [Compl. ¶¶ 161-62.]

In her complaint, the plaintiff asserts that this Court has jurisdiction over the case, pursuant to 28 U.S.C. § 1331, because, in light of her RICO claim, this action arises under the laws of the United States. [Compl. ¶ 2.] The plaintiff also asserts that this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. [Compl. ¶ 3.]

On October 21, 2011, defendants Wilson Valera and County Recovery SI Corporation moved to dismiss the plaintiff's complaint under Fed. R. Civ. P. 12(b). [*See* Defs.' Mem. of Law 1.] And on December 9, 2011, I granted an application, filed by defendants Oliva, United Auto, Styland Collision, Inc., and Styland Recovery Inc., to join in this motion to dismiss.[7] [Minute Order 12/09/2011.] In their motion, the defendants argue that, because the plaintiff's alleged damages do not exceed the $75,000 amount-in-controversy requirement, and because she does not allege diversity of citizenship, the plaintiff's sole federal claim is her RICO claim. [Defs.' Mem. of Law 1.] This the plaintiff does not dispute. [Pl.'s Mem. of Law 3.] The defendants argue, however, that this Court lacks subject matter jurisdiction over the action because the plaintiff "has utterly failed to plead a sustainable RICO claim with sufficient particularity," as required by Fed. R. Civ. P. 9(b). [Defs.' Mem. of Law 1, 3.] Specifically, the defendants assert that the plaintiff has failed to allege a "pattern of racketeering activity," as defined by 18 U.S.C.

---

[7] It is unclear whether defendants 75 Towing Inc. and United Towing Inc. will be filing any kind of opposition to the complaint.

§ 1961(5), consisting of at least two predicate acts by the defendants. [Defs.' Mem. of Law 2-3.] Because the defendants' argument is that the plaintiff has failed to state a viable RICO claim and has failed to plead this claim with the requisite particularity—and that for *those* reasons this Court lacks subject matter jurisdiction over this action—I consider the defendants' motion to be one brought under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## DISCUSSION

### I. Pleading Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In *Iqbal*, the Supreme Court advanced a two-pronged approach to considering a motion to dismiss. First, a court can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. The Court explained that, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*; *see also id.* at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950; *see also Goldstein v. Pataki*, 516 F.3d 50, 53 (2d Cir. 2008) (observing that, in deciding a motion to dismiss, the allegations in the plaintiff's complaint must be taken as true and all reasonable inferences must be drawn in the plaintiff's favor).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 129 S. Ct. at 1949. This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In sum, if the plaintiff's complaint here fails to allege "enough facts to state a claim to relief that is plausible on its face," it must be dismissed. *See Twombly*, 550 U.S. at 570.

## II. Consideration of Matters Extraneous to the Complaint

As the Second Circuit has held, in considering a motion to dismiss, a court can consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may neverless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint.").

Here, the plaintiff attached several documents to her complaint as exhibits, and there is no problem in considering those in ruling on this motion to dismiss. With her opposition memorandum, the plaintiff filed (1) a list of NYS DMV complaints filed against the defendants by the plaintiff and others, (2) the NYS DMV Violation Codes, and (3) documentation from the New York City Department of Consumer Affairs regarding complaints filed against, and violations committed by, the defendants. The plaintiff does not incorporate these documents by reference, nor does she explicitly rely on them. She does, however, implicitly rely on them in her complaint, as they support her allegations that "consumers **regularly** attempt to file

complaints against the various and assorted entities formed by Defendant Vincent Oliva and Defendant Wilson [Valera]," that the defendants "perpetuated a fraud not only against the Plaintiff, but also against other consumers—both from New York State and out-of-state—from whom the [defendants] solicited business," and that the fraud perpetuated against the plaintiff is a "repeat offense." [Compl. ¶¶ 59, 73, 79, 85, 95, 96.] Because the plaintiff effectively relies on these documents, I will consider them in ruling on this motion to dismiss. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("Although the amended complaint in this case does not incorporate the Agreement, it relies heavily upon its terms and effect; therefore, the Agreement is 'integral' to the complaint, and we consider its terms in deciding whether [the plaintiff] can prove any set of facts that would entitle it to relief.").

### III. Pleading Fraud with Particularity

Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This provision applies to RICO claims for which fraud is the predicate illegal act." *Moore v. Painewebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999); *see also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) ("[A]ll allegations of fraudulent predicate acts[ under RICO] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).").

"[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). "In addition, the plaintiff[] must allege facts that give rise to a

15

strong inference of fraudulent intent." *Moore*, 189 F.3d at 173 (internal quotation marks omitted).

## IV. RICO

RICO "provides a private civil action to recover treble damages for injury 'by reason of a violation of' its substantive provisions." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481 (1985) (quoting 18 U.S.C. § 1964(c)). "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (internal quotation marks omitted). This case implicates the first of these elements—namely, whether the plaintiff has adequately alleged a violation of the RICO statute.

Here, the plaintiff alleges that the defendants violated 18 U.S.C. § 1962(b), which renders criminally and civilly liable "any person" who acquires or maintains an interest in or control of an enterprise engaged in interstate commerce "through a pattern of racketeering activity." 18 U.S.C. § 1962(b); *see also H.J., Inc. v. Nw. Bell. Tel. Co.*, 492 U.S. 229, 232 (1989). The more specific issue raised by the defendants is whether, in her complaint, the plaintiff has adequately pled a "pattern of racketeering activity" so as to survive the defendants' motion to dismiss. *See Spool*, 520 F.3d at 183.

RICO's definitional section states that a "'pattern of racketeering activity' requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in § 1961(1), and they must be 'related, and [either] amount to or pose a threat of

16

continuing criminal activity.'" *Spool*, 520 F.3d at 183 (alteration in original) (quoting *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). The Supreme Court has held that acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (internal quotation marks omitted). And the continuity requirement "can be satisfied either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 183 (citing *H.J. Inc.*, 492 U.S. at 241).

Applying these principles to the case at hand, it must be determined whether the plaintiff has adequately alleged "at least two acts of racketeering activity," and whether the alleged acts are ones that fall among those enumerated in 18 U.S.C. § 1961(1). In her complaint, the plaintiff lists Oliva's and Valera's violations of 18 U.S.C. § 1962(b) as two separate predicate acts. Nevertheless, as pled, they are one and the same act of misconduct against the plaintiff—namely, these defendants' alleged fraud against her. The factual allegations in the complaint could arguably support two separate frauds: the first against The Hartford for fraudulently inducing it to make a payment of $19,731.67 for repairs without the intent to actually make the repairs, and the second against the plaintiff for depriving her of her use of the car based on fraudulent promises that it would be repaired within a specified time frame. The complaint, at most, conflates these two acts. In the relevant section of her complaint, however, the plaintiff only says that her car was towed by the defendants and that the defendants were found by the NYS DMV to have committed fraud against her. [Compl. ¶¶ 77-78, 83-84.]

"Mere common-law fraud[, however,] does not constitute racketeering activity for RICO purposes." *Cofacrèdit, S.A.*, 187 F.3d at 242; *see also* 18 U.S.C. § 1961(1). Mail fraud in violation of 18 U.S.C. § 1341 does constitute a predicate act. "To prove a violation of the mail fraud statute, plaintiffs must establish the existence of a fraudulent scheme and a mailing in furtherance of the scheme." *McLaughlin v. Anderson*, 962 F.2d 187, 190-91 (2d Cir. 1992). "While there is no requirement that the defendant personally mail a letter, the plaintiff must show 1) that the defendant caused the mailing and 2) that the mailing was for the purpose of executing the scheme or incidental to an essential part of the scheme." *Id.* at 191 (internal quotation marks and alterations omitted). "[A]ny mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (internal quotation marks, citation, and alteration omitted).

"We have construed [the mail fraud statute's] causation requirement liberally. In order to show that the defendant 'caused' the mailing, it need only be shown that he acted 'with knowledge that the use of the mails will follow in the ordinary course of business,' or that 'such use can reasonably be foreseen, even though not actually intended.'" *United States v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998) (citation omitted) (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)). "[I]t is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue, providing . . . the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act." *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989). On the other hand, "[a] mailing cannot be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition." *United States v. Altman*, 48 F.3d

18

96, 103 (2d Cir. 1995). In addition to meeting Rule 9(b)'s pleading requirements, "[p]laintiffs asserting mail fraud must also identify the purpose of the mailing within the defendant's fraudulent scheme." *McLaughlin*, 962 F.2d at 191.

Here, although the plaintiff does not allege that the mails were used, nor does she even allege mail fraud as a predicate act, the check for $19,731.67 that The Hartford made out to United Auto may constitute a mailing in furtherance of the defendants' fraudulent scheme. If so, the defendants arguably "caused" this mailing because they could reasonably have foreseen that the plaintiff's insurance company would use the mail in the ordinary course of business in order to pay United Auto for the repairs the plaintiff expected it to complete. This mailing was also incidental to an essential part of the defendants' alleged scheme in that it was arguably the scheme's purpose to get paid for repairs the defendants never intended to complete. The receipt of such payment was, therefore, essential to the scheme's success.

The two demand letters Brown, the plaintiff's attorney, mailed to United Auto on May 24, 2010 and July 9, 2010 also arguably constitute mailings for purposes of the mail fraud statute. The defendants could reasonably have foreseen that, as a result of their failure to timely repair the plaintiff's car, she, or her attorney, would have used the mails to inquire about the status of the repairs. For this same reason, these demand letters were incidental to an essential part of the defendants' scheme—that essential part being the failure to actually make the repairs as promised.

The plaintiff also meets Rule 9(b)'s heightened pleading standard by having (1) specified the allegedly fraudulent statement (through the attachment of Oliva's letter to her complaint), (2) identified the speaker (Oliva), (3) stated where and when the statements were made (in the letter,

19

and on June 22, 2010), and (4) shown that the statements were fraudulent (by stating that the car was not repaired and returned by July 14, 2010 as had been promised in Oliva's letter).

I add these words with respect to the plaintiff's claims that the defendants tow cars from the 62 Richmond Terrace parking lot "without just cause," have an agent set up at that lot for the specific purpose of towing the cars of the nearby stores' customers, and then charge these customers high sums for the return of their car.  These claims fail to properly plead a predicate act because, apart from not being pled with the requisite particularity under Rule 9(b), it fails to allege the use of the mails or that the conduct constituted a violation of the mail fraud statute. The same is true with respect to the plaintiff's effort to plead seven additional predicate acts by stating that the fraud the defendants committed against her is a "repeat offense" and that "[e]ach instance of fraud perpetuated by the [defendants] against other members of the public . . . constitutes a separate predicate act."[8]  [Compl. ¶¶ 95-96.]

## CONCLUSION

The defendants' motion to dismiss the complaint is granted with leave to replead.  Before any further effort is expended on this case, however, I direct the magistrate judge to hold a settlement conference with the parties.

SO ORDERED.

Brooklyn, New York
August 20, 2012

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge

---

[8] Based on the documents from the NYS DMV, the plaintiff alleges in her opposition memorandum, rather than the complaint, that the defendants have previously committed fraud against another unsuspecting consumer—a complaint of which was made on January 13, 2010. [DE 22 at 12.]  This claim is likewise defective without allegations that would satisfy Rule 9(b) and 18 U.S.C. § 1341.